# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **EXELON GENERATION CO., LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 06 C 5516** |
| | ) | |
| **GENERAL ATOMICS TECHNOLOGIES CORP.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case arises from a series of uranium supply contracts between plaintiff Exelon Generation Co., LLC, a power-generation business, and Heathgate Resources Proprietary Ltd., a subsidiary of defendant General Atomic Technologies Corp. ("GATC"), and between Exelon and GATC. Exelon sued GATC for fraudulent inducement and breach of contract. Exelon and GATC have filed cross-motions for summary judgment on Exelon's breach of contract claims. GATC has also moved for summary judgment on Exelon's fraudulent inducement claim; the Court denied GATC's motion as to that claim in an oral ruling on March 7, 2008. For the reasons set forth below, the Court grants in part and denies in part both sides' motions for summary judgment on the breach of contract claims.

### Facts

Exelon entered into two contracts with Heathgate on October 3, 2001 and April 30, 2002, in which Heathgate agreed to deliver up to 525,000 pounds of uranium concentrates in 2003, 690,000 pounds per year in 2004 and 2005, and 450,000 pounds in 2006. In total, the contracts

called for Heathgate to supply Exelon 2,355,000 pounds of uranium. The contracts set fixed prices for each year, ranging from $10.30 to $11.04 per pound.

On August 31, 2003, Exelon entered into a contract with another GATC subsidiary, Nuclear Fuels Corporation, in which NFC agreed to deliver up to 275,000 pounds per year of uranium to Exelon in 2005, 2006, and 2007, at prices ranging from $10.89 to $11.29 per pound.

On March 31, 2004, Susan Speight and Larry Davis, representatives of Heathgate and GATC, met with James Nevling of Exelon at Exelon's Illinois offices. At that meeting or shortly thereafter, Heathgate and GATC representatives stated that Heathgate was experiencing financial and production difficulties that prevented it from being able to perform its contractual obligations to Exelon. The Heathgate / GATC representatives said that Heathgate's uranium resources were diminishing, its recovery rates were lower than anticipated, and it did not have the resources to search for additional uranium. They advised that if Exelon did not relieve Heathgate of its obligations to deliver the full quantities of uranium called for in the Heathgate contracts, Heathgate was likely to be forced into formal reorganization, an Australian process equivalent to bankruptcy. Over the next several months, Heathgate and GATC repeated these representations, consistent with what Exelon contends was a concerted effort to escape Heathgate's contractual obligations so it could take advantage of an increase in the market price for uranium.

In October 2004, Exelon agreed to a modification of the Heathgate contracts on the condition that GATC participate in any renegotiation as a guarantor. Exelon and Heathgate signed amendments to the contracts, effective December 21, 2004, that deferred the remaining delivery dates from 2004, 2005, and 2006 to 2007, 2008, and 2009, reduced the overall uranium

quantities to be supplied from a total of up to 1,830,000 pounds to a total of up to 525,000 pounds (126,000 pounds in 2007, 241,500 pounds in 2008, and 157,500 pounds in 2009), and raised the contract prices to a range of $11.20 to $11.89 per pound, depending on the year of delivery.

At the same time, Exelon and GATC entered into an agreement that both incorporated and guaranteed Heathgate's performance under the amended contracts. GATC's guarantee provided, in relevant part, as follows:

> This Guarantee shall constitute a guarantee of performance and not of collection.
>
> GATC agrees to promptly and faithfully perform Heathgate's obligations under the Contracts if Heathgate fails to perform such obligations for any reason other than reasons excused, limited or provided for in the Contracts.
>
> The obligations of GATC under this Guarantee shall be absolute and unconditional, and shall remain in full force and effect until Heathgate fully performs its delivery obligations under the Contracts. GATC shall not be released or discharged for any reason.
>
> GATC specifically agrees that Exelon need not file suit or otherwise assert any claim against Heathgate for any failure to perform its obligations under the Contracts before, or as a condition of, enforcing GATC's liabilities under this Guarantee.

2d Am. Compl., Ex. C, §§ 1.2, 1.3, 1.4 & 6.2.

On January 12, 2006, Exelon set a final delivery date of June 6, 2006 for that year's delivery from NFC. On May 16, 2006, NFC requested a meeting with Exelon to discuss its contract. On May 22, 2006, NFC wrote to Exelon to confirm a meeting scheduled for May 31, 2006 and to state that NFC anticipated that it would not perform its delivery obligations.

At the meeting on May 31, 2006, Exelon representatives met with David Christensen, vice president of GATC and acting president of NFC, and Horst Maerten, president of Heathgate. Christensen and Maerten stated that neither NFC nor Heathgate would perform

Heathgate's delivery obligations. After the meeting, representatives of GATC, NFC, and Heathgate proposed that NFC would deliver 500,000 of the 550,000 pounds of uranium remaining to be delivered under the NFC contract's two remaining years on the condition that Exelon agree to release Heathgate from its obligation to make any future deliveries. NFC did not deliver the previously scheduled shipment of 275,000 pounds of uranium on June 6, 2006, nor did it make any subsequent deliveries. NFC's alleged breach is the subject of a separate suit brought by Exelon.

On June 23, 2006, Exelon demanded in writing that GATC honor its guarantee of performance of Heathgate's repudiated delivery obligations. On July 14, 2006, GATC wrote Exelon, stating that it did not believe Heathgate had repudiated its contract with Exelon. That same day, Heathgate wrote Exelon, purporting to withdraw its repudiation of the contract. On August 1, 2006, Exelon provided a binding delivery notice to Heathgate, setting January 2007 as the month for Heathgate's 2007 delivery to Exelon.

On August 7, 2006, Exelon wrote Heathgate and demanded specific written assurances by September 6, 2006 that Heathgate was willing and able to perform its January 2007 delivery obligation. Instead, on September 5, 2006, Heathgate declared commercial impracticability under the contracts. As a result, Exelon wrote GATC again on September 21, 2006, demanding that GATC confirm in writing within seven days that it would perform its obligations under the guarantee. On September 27, 2006, GATC responded, stating that it would not perform.

Exelon sued GATC on October 11, 2006. Its second amended complaint includes three claims. Count 1 is a claim of fraudulent inducement, in which Exelon alleges that GATC made knowingly false statements to Exelon in 2004, in reliance on which Exelon entered into the

amendments to the Heathgate contracts and the GATC guarantee. The Court previously denied GATC's motion for summary judgment on Count 1. Counts 2 and 3 are claims for breach of contract; in Count 2, Exelon seeks specific performance by GATC, and in Count 3, Exelon seeks, in the alternative, an award of damages. In these claims, Exelon alleges that GATC breached its guarantee of performance by repudiating its obligations and failing to deliver the uranium called for in the amended Heathgate contracts.

## Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court, when determining whether a genuine issue of material fact exists, must view the facts in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When the Court has been presented with cross-motions for summary judgment on the breach of contract claims, it considers each party's motion separately and draws reasonable inferences against the party whose motion is under consideration. *See Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (citing *Brownlee v. City of Chicago*, 983 F. Supp. 776, 779 (N.D. Ill. 1997)). The Court will apply New York law, which governs both the Heathgate contracts and the GATC guarantee, to Exelon's breach of contract claims.

Exelon alleges that GATC breached its guarantee because it failed to perform after Heathgate allegedly breached its uranium contracts with Exelon. To prevail on a breach of contract claim under New York law, the plaintiff must prove the existence of a contract; its

performance under that contract; defendant's breach of the contract; and resulting damages. *See Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (App. Div. 1986).

Exelon claims that in 2004, it entered into a binding guarantee agreement with GATC, which unconditionally required GATC to specifically perform Heathgate's obligations under the amended contracts should Heathgate fail to do so. Exelon also claims that after Heathgate repudiated the amended contracts, Exelon performed its obligations by making a written demand of performance but that GATC breached by failing to perform Heathgate's delivery obligations. Exelon contends that it was damaged when it was unable to get either the security of an assured supply of uranium or the delivery of uranium.

## A.     GATC's motion

GATC seeks summary judgment on Count 2, arguing that specific performance is not appropriate in this case. GATC also seeks partial summary judgment on Count 3 based on contractual language limiting damages. In addition, GATC seeks summary judgment on Counts 2 and 3 on the ground that it appropriately terminated the guarantee after Exelon allegedly breached its confidentiality provisions. The Court will begin by addressing GATC's last argument.

### 1.     GATC's purported termination of the guarantee (Counts 2 and 3)

GATC argues that its guarantee was terminated on August 30, 2007 and that as a result, any claims under the guarantee were also terminated. GATC bases its argument on Exelon's alleged breach of the confidentiality provision contained within the guarantee. The provision allows GATC to terminate the guarantee if it "learns that any third party has obtained knowledge of the existence of this Guarantee and/or the terms and conditions hereof . . . unless Exelon can

clearly establish, to the reasonable satisfaction of GATC, that the knowledge of the third party

was not as a result of a breach by Exelon." 2d Am. Compl., Ex. C at 5. During a deposition on

July 18, 2007, James Graham, a former employee of Heathgate who left the company in or

around April 2004, testified that he first learned of the GATC guarantee from James Malone of

Exelon at some point during the six months preceding the deposition. The following month, as a

result, GATC purportedly terminated the guarantee.

In response, Exelon argues that by its terms, the guarantee does not allow GATC to

discharge liabilities that had accrued before the date of termination. Specifically, the guarantee

states that "[n]o termination shall affect, release or discharge GATC's liability with respect to

any obligations existing or arising under the Contract(s) prior to the effective date of termination,

which obligations shall remain guaranteed pursuant to the terms of this Guarantee." 2d Am.

Compl., Ex. C at 3.

The contractual language that Exelon has cited is sufficient, in the Court's view, to

preclude entry of summary judgment in GATC's favor on Counts 2 and 3 based on its

termination argument.

### 2.     Construction of contractual damages limitation (Count 3)

GATC also argues that because of contractual language limiting damages, Exelon cannot

claim damages in excess of the product of the number of pounds called for in the contract and

the contractual price per pound. The relevant section of each contract, entitled "Article 14 –

Liabilities," reads as follows:

> 14.1    If either party defaults in the performance of its obligations under this Contract
> and such default continues for a period of thirty (30) days after notice by the other
> party in default specifying the events of default, then that other party shall be
> entitled to pursue an action for damages and any other remedy available to the

parties under the provisions of this agreement, law, statute or otherwise.

14.2    Neither Party shall be responsible to the other party under this Contract for incidental, special, economic, indirect or consequential damages arising out of or in connection with the performance or non-performance of its obligations under this Contract, except for such loss and/or damage caused by or arising from willful act or gross negligence of the party.  In no event shall damages exceed the Price times the total number of pounds of Concentrates to be Delivered hereunder.

2d Am. Compl., Ex. A at 11; Ex. B at 10.

GATC argues that the reference in the last sentence of Article 14.2 to the "total number of pounds of Concentrates to be Delivered hereunder" refers to the quantities of uranium to be delivered under the contracts and that "Price" refers to the fixed price for each scheduled delivery, as set forth in Article 3.  GATC argues that as a result, the contracts cannot be interpreted to allow Exelon to seek cost-of-cover damages calculated using the market price at the time of the breach or when Exelon covered.  GATC contends that in requesting such damages, Exelon is asking the Court to add an unagreed term to the Heathgate contracts when "'the meaning of [a] . . . contract [that] is plain and clear . . . [is] entitled to [be] enforced according to its terms.'"  *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 341, 693 N.E.2d 740, 743 (1998) (quoting *Loblaw, Inc. v. Employers' Liab. Assurance Corp., Ltd.*, 57 N.Y.2d 872, 877, 442 N.E.2d 438, 441 (1982)).[1]

In response, Exelon argues that Article 14 does not apply, because, it contends, the provision is not incorporated into the GATC guarantee.  The guarantee states that GATC's obligations will be "absolute and unconditional" and that GATC will not "be released or

_____

[1]  Although GATC argues that the Court should not consider extrinsic evidence of the parties' intentions, it notes that in the event that the Court chooses to do so, the Exelon employee who negotiated the contract agrees with GATC's interpretation.

discharged for any reason."  2d Am. Compl., Ex. C at 1.  According to Exelon, under Article 2.1, the only defenses GATC did not expressly waive are certain defenses Heathgate might have to performance.  Article 2.1 provides that

> GATC reserves to itself all rights, setoffs, counterclaims and other defenses which Heathgate may have to performance of any obligation except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Heathgate or lack of validity of the Contracts.

*Id.* at 2.  Exelon contends that because the damages limitation in Article 14 is not a defense to performance, GATC waived it when it guaranteed absolute, unconditional performance of Heathgate's obligations.

The Court rejects Exelon's argument. The guarantee makes GATC's obligations coextensive with Heathgate's obligations, not greater than those obligations.  Article 2.1 must be read together with Article 1.3, which states that

> GATC agrees to promptly and faithfully perform *Heathgate's obligations* under the Contracts if Heathgate fails to perform such obligations for any reason other than reasons excused, *limited* or provided for in the Contracts.

*Id.* at 1 (emphasis added).  The word "limited" in Article 1.3 reflects that Heathgate's obligations, and thus GATC's obligations, are limited in the same way, including the limitation on damages set forth in Article 14.2.

The Court turns next to the question of how Article 14.2 should be read.  GATC argues that the provision is clear and unambiguous; it imposes a limitation on all types of damages, including cost-of-cover damages; and its reference to "Price" limits damages to the contract price, not the higher price that GATC would have to pay to cover when Heathgate did not deliver.  Exelon argues that the damage limitation in Article 14.2 applies only to indirect or consequential damages, not cost-of-cover damages like those it seeks in Counts 2 and 3 and that,

9

in any event, the reference to "Price" in Article 14.2 means the price at which it obtained other uranium when Heathgate did not deliver, not the contract price.

As the Second Circuit has stated:

Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties. An ambiguity exists where the terms of a . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. If an ambiguity is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. We have explained that if the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment.

*Int'l Multifoods Corp. v. Comm'l Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (applying New York law; internal quotation marks and citations omitted).

The Court sees two ambiguities in Article 14.2 that preclude entry of summary judgment. First, it is unclear whether the limitation on damages in Article 14.2 applies only to the types of damages referenced in that provision – consequential or other indirect damages – or instead applies to all types of damages, including direct, cost-of-cover damages. A reasonably intelligent person, reading Article 14.2 objectively, could come out either way. Because the limitation appears in a contract term that otherwise discusses only indirect damages, it reasonably can be read as limiting only damages of that type. On the other hand, because the limitation does not expressly apply to "such" damages – in other words, to indirect damages of the type discussed just before the limitation – it reasonably can be read as limiting *all* damages, not just indirect damages.

Second, the limitation of damages to the quantity to be delivered times the "Price" is ambiguous, in the Court's view. Because the limitation refers to "the Price" times the quantity "to be Delivered hereunder," it reasonably could be read as a cross-reference to the price listed in the contract. The capitalization of "Price" provides some support for this interpretation. On the other hand, the reference to "the Price" could be read as a reference to the price Exelon pays to cover in the event of a nondelivery. In this regard, Exelon has introduced the testimony of James Graham, Heathgate's president and chief executive officer at the time of contracting, that people in the uranium business would understand the term "Price" to refer to the price at which the buyer covered, not the contract price. Graham Dep. 5/8/07 at 225-29. Under the Uniform Commercial Code as adopted in New York, terms in an integrated contract like those at issue here "may be explained or supplemented . . . by . . . usage of trade," a term defined as "any practice or method of dealing having such regularity of observance in a . . . trade as to justify an expectation that it will be observed with respect to the transaction in question." N.Y. U.C.C. Law §§ 2-202(a), 1-205(2) (McKinney 2008). These provisions do not permit evidence of custom or trade usage to be introduced when it would contradict or be inconsistent with a contract term. *See Div. of Triple T Serv., Inc. v. Mobil Oil Corp.*, 60 Misc. 2d 720, 731, 304 N.Y.S.2d 191, 202-03 (Sup. Ct. 1969); *Cliffstar Corp. v. Cape Cod Biolab Corp.*, 37 A.D.3d 1073, 1074, 829 N.Y.S.2d 779, 780 (App. Div. 2007). But the UCC does permit the admission of trade usage evidence to explain a contract term, even if it has not been found ambiguous. *See Walk-In Med. Ctr. v. Breuer Capital Corp.*, 818 F.2d 260, 264 (2d Cir. 1987) (applying New York law); N.Y. U.C.C. Law § 2-202, cmt. 1(c) (McKinney 2008) ("This section definitely rejects . . . [t]he requirement that a condition precedent to the admissibility of [trade usage]

evidence . . . is an original determination by the court that the language used is ambiguous."). Graham's testimony is admissible to assist in the interpretation of Article 14.2.[2]

When interpretation of an ambiguous contract depends, as it does in this case, on evidence other than the contract itself, it presents questions of fact that a jury must decide. *See, e.g., Hartford Accid. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172, 305 N.E.2d 907, 909 (1973). As a result, GATC is not entitled to a ruling on summary judgment that Exelon's damages are limited to the contract price multipled by the quantity that Heathgate failed to deliver.

### 3. Availability of specific performance (Count 2)

GATC contends that Exelon is not entitled to specific performance because money damages are an adequate remedy in this case. Under New York's version of the UCC, "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances." N.Y. U.C.C. Law § 2-716(a) (McKinney 2008). Though a comment to this provision indicates that it "seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale," *id.*, cmt. 1, Exelon has offered no evidence from which a finding reasonably could be made that the goods in question were unique or that "other proper circumstances" exist.

First, the Court rejects Exelon's argument that the contract language itself makes specific performance appropriate. Exelon relies on language stating that GATC guaranteed "that Heathgate will punctually and fully perform its delivery obligations when sued," the guarantee

---

[2] The Court need not address at this time the admissibility of the other purported trade-usage evidence that Exelon cites.

"shall constitute a guarantee of performance and not of collection," and GATC would "promptly and faithfully perform Heathgate's obligations" if Heathgate failed to do so. 2d Am. Compl., Ex. C, §§ 1.1 - 1.3. These provisions describe GATC's obligations; they do not dictate the remedy for breach of those obligations.

Second, the New York cases that Exelon cites for the proposition that guarantee contracts are always enforceable by specific performance, as otherwise such contracts would be meaningless, are not controlling. Both of the cases that Exelon cites involved guarantees relating to security interests in specific collateral, a situation that does not exist in this case. *See TCW Gem V. Ltd. v. Grupo Iusacell Cellular, S.A. de C.V.*, 801 N.Y.S.2d 243, 2004 WL 3267267, at *4 (Sup. Ct. July 16, 2004); *Nat'l Sur. Corp v. Title Constr. Corp.*, 26 N.Y.S.2d 227, 230 (Sup. Ct. 1940).

The Court also rejects Exelon's argument that damages are inadequate because it requires a reliable stream of uranium and if it had to purchase uranium on the spot market, doing so would raise the market price, causing its subsequent purchases to be more expensive. The Court has a hard time seeing how that would make damages inadequate; it would seem that it would simply increase the amount recoverable as damages. *Cf.* 12 Corbin on Contracts § 1146 (2007) ("Specific performance of a contract for the sale of [goods] will not, apart from statute, be decreed if such [goods] are readily procurable in the market. The cost of obtaining them can be ascertained; and money damages are adequate."). In any event, however, Exelon has failed to offer admissible evidence that reasonably would permit a finding that this hypothetical effect would occur. Exelon points to a report by its expert witness Gene Clark, which includes a statement that a purchase of 525,000 pounds of uranium on the open market would have the

effect of raising the market price. As GATC argues, however, neither Clark nor Exelon has offered any foundation supporting the admissibility of this particular opinion.

Finally, the cases Exelon cites for the proposition that specific performance is always available when a long-term supply contract is intentionally breached are unpersuasive. *See Laclede Gas Co. v. Amoco Oil Co.*, 522 F.3d 33, 38-40 (8th Cir. 1975) (applying Missouri law); *Mo. Pub. Serv. Co. v. Peabody Coal Co.*, 583 S.W.2d 721, 725-28 (Mo. App. 1979). Though these cases were decided under the UCC (albeit in Missouri), the fact that Exelon has been able to find only two thirty-year-old Missouri decisions suggest that specific performance of a long-term contract for the sale of a fungible good for which a market exists is the exception rather than the rule.

For these reasons, the Court grants summary judgment in favor of GATC on Count 2.

**B.      Exelon's Motion**

Exelon moves the court for summary judgment of GATC's liability on Counts 2 and 3, and on the appropriateness of specific performance as a remedy in Count 2. Because the Court has determined that GATC is entitled to summary judgment on Exelon's claim for specific performance, the Court denies Exelon's motion as to Count 2. In support of its motion for summary judgment as to liability on Count 3, Exelon argues that it has satisfied all of the elements of a breach of contract claim against GATC and that GATC's affirmative defenses, including commercial impracticability, lack merit.

GATC effectively concedes that Exelon has satisfied all of the required elements for liability on its breach of contract claim but raises two defenses. GATC first argues that it cannot be liable to Exelon because it purportedly terminated its guarantee in August 2007. The Court

has already rejected this argument.  As explained earlier, the guarantee's language expressly releases GATC only from prospective liability following termination.  In this case, Exelon is suing GATC based on pre-termination obligations.

GATC's second defense, to which the parties devote most of their argument, is that its obligations, along with Heathgate's, are excused under the doctrine of commercial impracticability because of a confluence of unforeseeable contingencies.  GATC contends that Heathgate had to decrease its estimate of recoverable reserves by nearly 13 million pounds after it switched to a new reserve-estimating tool.  GATC further contends that Heathgate's unit cost of production tripled between 2002 and 2006 due to the United States dollar's decline against the Australian dollar, inflation in the Australian mining sector, and an increase in chloride content of the uranium in the mine.  As a result, GATC argues, Heathgate had insufficient reserves and inventory to meet its contractual commitments, and performing the contracts according to their terms would have had a severe effect on Heathgate's financial viability.

The New York Uniform Commercial Code codifies the common law doctrine of commercial impracticability by excusing a seller from performance "made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made."  N.Y. U.C.C. Law § 2-615(a) (McKinney 2008).  The rule "is based on the notion that where the parties can reasonably anticipate events that may affect performance, the prudent course is to provide for such eventualities in their contract."  *Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 517 F. Supp. 440, 454 (E.D. Va. 1981).  The contingency the seller relies upon cannot be one that was foreseeable at the time of contracting.  N.Y. U.C.C. Law 2-615(a), cmt. 1 (McKinney 2008) ("This section excuses a seller . . . where his performance has

become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting."). Finally, if an unexpected contingency causing impracticability affects only a part of the seller's capacity to perform, the seller must allocate its goods among customers in a "fair and reasonable" manner. *Id.* § 2-615(b).

Exelon contends that Heathgate's rising production costs and its reduced reserves and inventory were all foreseeable in 2004 when the amendments to the Heathgate contracts were signed. In fact, Exelon argues, Heathgate claimed that these very same contingencies existed in 2004 and used them to induce Exelon to amend the contracts. GATC's argument is not so much that these contingencies themselves were unforeseeable, but that their magnitude was unforeseeable.

**Production costs**

Exelon argues that because Heathgate claimed in 2004 that rising production costs required it to amend its contracts with Exelon, GATC cannot now claim that later increases were, as required by section 2-615(a), a contingency the nonoccurrence of which was a basic assumption underlying the contracts. Exelon alleges that at the March 31, 2004 meeting between the parties, representatives of Heathgate and GATC told Exelon that Heathgate's cost of production had increased. They made a presentation to Exelon that highlighted their rising production costs, claiming that though costs in 2002 had been $11.50 per pound, they were expected to average $15.00 per pound in 2004. On May 7, 2004, Heathgate told Exelon that it needed to renegotiate its contracts with Exelon because of "increased costs due to the relative strength of the Australian dollar over the US dollar." PX 10 at 2. An August 2004 valuation of

16

Heathgate's Beverley uranium mine resources, completed prior to the date Heathgate amended its contracts with Exelon, stated, "[a] processing solution has yet to be developed for the high chloride content of South.  It is impossible to accurately predict the likely associated costs at this stage."  PX 90 at 6.  In sum, Exelon contends that rising production costs had been a continuous reality for Heathgate from the time it began mining uranium at the Beverley mine, and that it well knew the unpredictable nature of such increases.  Pl. 56.1 Stat. ¶ 49.

Exelon also contends that courts have long held that rising production costs are foreseeable, and "[i]ncreased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance."  N.Y. U.C.C. Law § 2-615, cmt. 4 (McKinney 2008).  In *Maple Farms v. City School Dist. of City of Elmira, N.Y.*, 76 Misc. 2d 1080, 352 N.Y.S.2d 784 (Sup. Ct. 1974), a milk seller sought a declaratory judgment of commercial impracticability after rising costs increased the cost of delivering milk to defendant to more than ten percent over the contractual price.  Because the seller had entered into a fixed price contract, the purpose of which was to allow both parties to guard against fluctuation of milk prices, the court held that the risk of "substantial or abnormal" price increases was allocated to the seller.  *Id.* at 1085.  In a case in which a uranium seller claimed impracticability because increased production costs made performance unprofitable, the court held that although it "would be unfair to expect [the seller] to have prophesied the magnitude of the increases complained of," the seller could not rely on them to discharge its liability because it could have protected itself contractually.  *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 467 F. Supp. 129, 134-35 (N.D. Iowa 1978), *rev'd on other grounds*, 603 F.2d 1301 (8th Cir. 1979).

GATC responds that Heathgate could not have foreseen the rapid rate at which its costs of production rose and that the risk of the increase occurring was allocated to Exelon.  GATC contends that the increase was "the result of a perfect, but unexpected storm" of factors, including the Australian dollar's decline against the United States dollar, inflation in the Australian mining sector, and an increase in the uranium ore's chloride content.  Def. Resp. at 14.  All of these factors, GATC asserts, were unanticipated.  GATC argues that the magnitude of the cost increase is extraordinary because, it contends, Heathgate lost $4.2 million in connection with its 2003 and 2004 deliveries to Exelon and would lose an additional $10 million if it performed under the amended contracts.  In *Aluminum Co. of Am. v. Essex Grp., Inc.*, 499 F. Supp. 53, 76 (W.D. Pa. 1980), the court excused the plaintiff from its obligations under a contract with an escalation clause indexed to both the Wholesale Price Index-Industrial Commodities ("WPI") and the labor rates paid to the plaintiff's employees.  *Id.* at 55.  The court found that a basic assumption of the contract was that any increase in the plaintiff's costs would correspond to an increase in the WPI.  *Id.* at 72.  As a result, the risk of a great disparity between the actual costs and the WPI was not allocated to the plaintiff, which would have lost $75 million over the life of the contract if forced to perform.  *Id.*

GATC also cites *Moyer v. City of Little Falls*, 134 Misc. 2d 299, 510 N.Y.S.2d 813 (Sup. Ct. 1986), in which a contractor sought to be excused from performing a waste-collecting agreement after the New York Department of Environmental Conservation closed a landfill, leading to a six-fold increase in the cost of dumping.  Because the government action created a "substantially unjust situation totally outside the contemplation of the parties," the court excused the contractor from performing.  *Id.* at 301, 510 N.Y.S. 2d at 815.

The cases GATC cites are distinguishable from the case at hand. Unlike the supplier in *Aluminum Co.*, Heathgate did not include a price escalation clause in its contract with Exelon to supply uranium. Instead, it chose to enter into multi-year, fixed-price contracts, both in the first instance and when it later amended the contracts. Likewise, GATC can point to no unforeseeable act by a third party, like the closure of the landfill in *Moyer*, that led to its increased production costs. Rather, it merely cites unfavorable exchange rates, inflation in the industry, and an increase in the chloride content of the uranium ore. As Exelon points out, the Court may take judicial notice of the fact that the exchange rate between the Australian and United States dollars changed very little between late 2004, when the Heathgate contracts were amended, and late 2006, when Heathgate declared impracticability.[3] *See* Fed. R. Evid. 201 (stating that a "judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *cf. Transorient Navigators Co. v. M/S Southwind*, 788 F.2d 288, 293 (5th Cir. 1986) ("The district court may properly take judicial notice of prevailing interest rates"). In addition, GATC has offered no evidence at all of the inflation in the mining sector to which it refers. As for the increase in the chloride content of the uranium, GATC itself cited "the hydro-geological, geochemical and other underground conditions unique to the Beverley site" as one of the justifications for amending the contracts in 2004 and was well aware of the uncertainty surrounding the costs of processing that uranium. PX 10 at E000468. Thus, that

---

[3] *See* Exchange Rates – Historic lookup, http://www.x-rates.com/cgi-bin/hlookup.cgi (last visited Mar. 26, 2008). After viewing the values gathered from the Federal Reserve Bank of New York, the Court takes judicial notice that the Australian dollar was worth $.766 USD on December 21, 2004, the day the Heathgate amendments were signed, and that it was worth $.77 USD on September 5, 2006, the day Heathgate declared commercial impracticability. *Id.*

factor was neither unforeseen nor outside the parties' contemplation.

GATC argues that nevertheless, the risk that the post-2004 cost increases would occur was allocated to Exelon through the damage limitation contained in Article 14 of the contracts. In support of this argument, GATC cites *Besicorp Grp., Inc. v. Thermo Electron Corp.*, 981 F. Supp. 86, 100 (N.D.N.Y. 1977), in which the court upheld a damages limitation clause on the grounds that it reasonably allocated risk between the parties. *Besicorp*, however, has nothing whatsoever to do with commercial impracticability; the court merely addressed whether the provision was enforceable.

The Seventh Circuit has held that a fixed price contract expressly assigns the risk of market price increases to the seller and the risk of market price decreases to the buyer. *Northern Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986). The Court has a hard time seeing how the analysis of assignment of the risk of production cost increases is any different. When a seller sets a fixed price, it takes on the risk that its production costs will increase to a point at which it can no longer sell at a profit. The doctrine of commercial impracticability, which is devised to "[shift] risk in accordance with the parties' presumed intentions," has "no place when the contract explicitly assigns a particular risk to one party or the other." *Id.* The Court agrees with Exelon's contention that Heathgate and GATC assumed the risk that production costs would rise. Thus, those cost increases cannot excuse GATC's performance.

### Reduced reserves and inventory

Exelon contends that Heathgate could and did anticipate that it would have to reduce its estimates of uranium reserves. As far back as 2001 and 2002, when Heathgate signed the

original contracts, it included a provision allowing it to supply uranium from other sources if, for any reason, uranium from the Beverley mine became unavailable. In its August 2004 business valuation, Heathgate noted that there was a "low level of confidence" in the quantity of uranium in reserve due to the "dated techniques (i.e. use of gamma logging)" that Heathgate used to estimate probable reserves. PX 90 at 6.

Exelon contends that in addition to anticipating the likelihood of inaccurate reserve estimates, Heathgate also knew in advance that the in-situ leach ("ISL") mining process it used at the Beverley mine was risky. A memorandum between Heathgate employees Mark S. Chalmers and Maerten on March 10, 2004 refers to ISL mining as "probably the riskiest of all the mining methods," and states that it was "by far less predictable and more variable than conventional" uranium mining methods. PX 153 at HG_GA_EX 00028881. Two months later, on May 7, 2004, in a letter to Exelon, Heathgate complained of production shortfalls due primarily to "uncertainties inherent in in-situ leach mining." PX 10 at 2. All of this evidence predates the 2004 amendments to the Heathgate contracts.

GATC argues that Heathgate could not have foreseen that it would have to reduce its estimates of pre-mining recoverable uranium reserves by 13 million pounds between 2001 and August 2006 because its reserve calculations were always conducted by experienced competent geologists following the Joint Ore Reserve Committee's established Code. GATC contends that because of write-downs in reserves following its improved estimate, Heathgate had only 5.4 million pounds of recoverable uranium left in the mine, rather than over 18 million pounds.

In *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 971 (Kan. App. 1981), a case with similar facts, the court rejected a natural gas seller's claim of impracticability

based on its discovery that its oil fields contained inadequate reserves.  In analyzing the issue of foreseeability, the court focused on the seller's knowledge at the time of contracting that the reserves were difficult to predict and that its estimates might be wrong.  *Id.*  Because the seller entered into a fixed quantity contract "before it was determined that that quantity existed and without any provision being made in the contract for such a contingency," the court concluded that the seller should have foreseen that the fields might not contain sufficient reserves.  *Id.* at 973.

In *Cliffstar Corp. v. Riverbend Prods., Inc.*, 750 F. Supp. 81 (W.D.N.Y. 1990), the plaintiff, a purchaser of tomato paste, argued that the defendant tomato paste supplier was aware of a tomato crop shortfall by the time it confirmed the plaintiff's late-July order.  *Id.* at 84-85.  Therefore, the purchaser contended, the supplier could have foreseen at the time of contracting that it would be unable to deliver the ordered tomato paste.  *Id.* at 85.  The supplier admitted that a disappointing Arizona tomato harvest had concluded by the time of the contract but said that it remained hopeful that the California harvest, which would not conclude until later, would make up the shortfall.  *Id.*  Furthermore, an industry report had forecasted that California's harvest would be larger than previously estimated.  *Id.*  The court ruled that there was a genuine issue of material fact as to whether the overall tomato crop shortage was foreseeable at the time the contract was made.  *Id.*

Unlike in *Cliffstar*, in which a jury reasonably could find that the supplier relied on estimates of a bumper crop when it entered into a fixed-volume contract, there is no evidence that Heathgate believed its reserves might be greater than it estimated.  Rather, it is undisputed that Heathgate was aware that its dated gamma logging estimation technique was likely

overestimating its reserves, or at the very least (like the seller in *Sunflower*) that its reserves were largely unknown. Furthermore, Heathgate knew early on the risks of ISL mining but entered into a fixed-volume contract with Exelon anyway. In entering into a fixed-volume contract while simultaneously contracting to obtain uranium elsewhere if it was unavailable from the Beverley mine, Heathgate allocated the risk of reduced production and reserves to itself, not to Exelon. Even if the precise magnitude of Heathgate's reduction in reserves was not foreseeable, there is no genuine issue of fact as to whether the reduction itself was.

Because the contingencies upon which GATC bases its impracticability argument were both foreseeable and actually foreseen by Heathgate, the impracticability defense is unavailable as a matter of law. The Court thus need not reach the questions of whether the contingencies made performance impracticable, whether Heathgate caused the impracticability itself, and, if the impracticability was only partial, whether Heathgate allocated its product in a fair and reasonable manner.

For the foregoing reasons, the Court concludes that Exelon is entitled to summary judgment on Count 3 as to GATC's liability for breach of contract.

### Conclusion

For the reasons stated above, the Court grants in part and denies in part GATC's motion for summary judgment [docket no. 70] and Exelon's motion for summary judgment [docket no. 66]. Summary judgment is granted in favor of GATC on Count 2 and in favor of Exelon as to liability on Count 3. The motions are otherwise denied. The case is set for a status hearing on April 12, 2008 at 9:30 a.m. Counsel are to be prepared to discuss what witnesses each side

expects to call at trial and the anticipated length of the trial.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 27, 2008